# United States Tax Court

T.C. Memo. 2025-118

JODELL SAMPLE,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

———————

Docket Nos. 4394-20, 22656-22, 11655-23L.

Filed November 17, 2025.

———————

*Eric Johnson*, for petitioner.

*Paul A. George*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, *Judge*: Joseph Schara is a dentist who has long practiced in Minnesota. His wife, Jodell Sample, has long worked with him as the office manager and receptionist. Their tax troubles began when the couple stopped reporting Schara's income from his dental practice on their return for 2011. Then they stopped reporting Sample's salary from the dental practice. Over the next several years, Schara continued to underreport their income and underpay their tax. Even though she signed every return they filed together, Sample says she caught on only when a revenue officer dropped by their office in 2015.

This revelation didn't seem to faze her. Schara continued to manage their finances. Sample continued to not worry about them, but the couple's tax debt grew to more than $300,000. She argues that Schara's deception about their situation continued for years, and she now wants to extract herself from their joint liability by requesting innocent-spouse relief from their joint liabilities for tax years 2011, 2012, 2013, 2014, 2017, and 2018.

**Served 11/17/25**

[*2]                     FINDINGS OF FACT

I.      *Their Marriage*

Schara and Sample were married in 1995. Schara owned his own dental practice and hired Sample as his office manager. The couple worked together for years, and his business was their main source of income. Sample's formal education had ended with high school, and she relied heavily on Schara when it came to the family's finances.

Sample didn't bother to check the mail. She signed their joint returns without reading them. Schara oversaw the couple's financial affairs; in his wife's eyes, he had a track record of solving any issues that arose, and he assured her that everything was taken care of. Though she worked alongside him, she did not show any interest in his business finances and never bothered to check his books. While she was aware that they had unpaid tax before the revenue agent's 2015 visit, Schara had consistently assured her that the tax debts were "just temporary" and that he would pay them.

By 2015, this "just temporary" problem had been going on for years. They had failed to pay the tax due at the time they filed their return for 2004, and it took them almost a decade to do so. They also had unreported income for tax years 2008 and 2010. The IRS knew about this and was launching correspondence at the couple, but as far as we can tell from the record, Sample wasn't involved in the resulting back-and-forth with the IRS or their accountant.

The couple legally separated in late March 2019 after Sample learned of the full extent of their financial problems. The terms of the separation were unusually favorable to her. Schara agreed to be solely responsible for their federal and state tax debts. Sample received one of their shared cars, their main residence in Minnesota, a second home in Montana, and Schara's entire section 401(k) account. We specifically note that their legal separation has not meant a physical separation. Although Sample has filed numerous innocent-spouse requests, she has continued to live with Schara in their marital home, at least into 2021 and with nothing in the record to suggest that this arrangement has not continued.

[*3] II.    *History of Innocent Spouse Requests*

Section 6015[1] offers (b), (c), and (f) relief, each named after its subsection.  After her legal separation began, Sample began trying to obtain relief from the accumulated tax debt.  For five of these years she filed two Forms 8857, Request for Innocent Spouse Relief.  For one of these years she asked for all three kinds of relief, but for the rest only (f) relief.  For the sixth year she asked for innocent-spouse relief at the hearing (called a collection-due-process, or CDP, hearing) that the Code offers taxpayers who face enforced collection of a tax debt.

We first describe in detail these requests, the method and kind of relief Sample sought, and then try to straighten out the resulting malocclusion of scopes and standards of review, as well as the different substantive standards for relief of each type that Sample seeks.

A.    *2011–14*

Sample submitted her first request for innocent-spouse relief for tax years 2011–14.  When filing their returns for those tax years, Sample and Schara either paid a *de minimis* amount of tax or withheld less than their tax due:

| Tax Year | Withholding Paid | Estimated Tax Paid | Tax Still Owed |
|---|---|---|---|
| 2011 | $1,163 | $200 | $81,344 |
| 2012 | 5,955 | — | 120,227 |
| 2013 | 6,155 | — | 78,062 |
| 2014 | 17,047 | — | 14,769 |

Sample's 2014 return was also the first where she omitted the wages from her job at the dental office.

By the end of 2021, the couple had an outstanding balance of $589,393 for these four years.  Sample sent the Commissioner her Form 8857 in April 2019 and included a list of assets and liabilities.  For the

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[*4] years 2011–13, she asked only for equitable relief under section 6015(f). For tax year 2014, she asked for (b) and (c) relief as well.

The IRS's Cincinnati Centralized Innocent Spouse Operation (CCISO) issued two preliminary determinations. Both denied Sample's requests. She filed an administrative appeal with the IRS[2] and asked for a chance to give oral testimony. The office denied this request and issued a final determination that denied her relief for all four years.

B. *2017*

On their 2017 return, the couple reported that they owed another $6,000:

| Year | Withholding Paid | Estimated Tax Paid | Tax Still Owed |
|------|------------------|--------------------|----------------|
| 2017 | $83,570 | $23,943 | $5,972 |

They did not pay, and the Commissioner sent Sample a notice of intent to levy[3] in June 2021. She asked for a CDP hearing soon after. In her request she asked for an installment agreement or an offer-in-compromise, or for the account to be placed in currently-not-collectible status. She abandoned her request for these collection alternatives shortly afterward and again asked for innocent-spouse relief from this underpayment. The Appeals officer (AO) assigned to her hearing sent her request off to CCISO, which once more made a preliminary determination to deny her relief.

Sample appealed the denial back to IRS Appeals. AO Rassenfoss sustained CCISO's denial and recommended that she send him any additional documents to make sure they made it into the administrative record, should she want to appeal again to our Court. This may not have been the best advice. Remember that Sample had made this request for innocent-spouse relief in the runup to her CDP hearing. CDP hearings are also held at IRS Appeals, but typically a different part of IRS Appeals. And so her request for relief was routed to the AO in charge of

---

[2] If CCISO denies an innocent-spouse claim, the taxpayer may request an administrative appeal at Appeals. IRM 25.15.1.10.1 (Jan. 27, 2023).

[3] When the Commissioner wishes to collect tax by seizing a taxpayer's property, he must issue a notice of intent to levy, which informs a taxpayer of her right to a CDP hearing. I.R.C. § 6330.

[*5] her CDP hearing.  That AO denied her (f) relief again and sustained the levy in a notice of determination issued in June 2023.

C.    *2018*

The couple again underpaid their tax for 2018:

| *Year* | *Withholding Paid* | *Estimated Tax Paid* | *Tax Owed* |
|---|---|---|---|
| 2018 | $61,225 | — | $5,972 |

Sample again asked for innocent-spouse relief.  Because the Commissioner had not tried to collect this debt, Sample reverted to sending in a Form 8857 directly to CCISO.  CCISO again denied her request, and Sample again filed an administrative appeal.  An AO sustained the denial but gave Sample time to submit more information to support her case.  She chose not to do so, and Appeals sent her a notice of determination.

She filed timely petitions with our Court to challenge each of these three notices of determination.  We consolidated all the cases.[4]

Sample consented to submit all three for decision without a trial under Rule 122.  We do note that Sample could have offered testimony at trial regarding any newly discovered or previously unavailable information.  She nevertheless agreed to submit the case fully stipulated.

OPINION

I.    *Innocent Spouse Relief Under Section 6015*

These cases are complicated because Sample asked for every different kind of innocent-spouse relief and did so both in stand-alone requests and as a defense to collection in her CDP case.  And neither she nor the Commissioner quite understood the complexity of some of these combinations.  We will organize our analysis to try to simplify it as much as reasonably possible.

---

[4] Since she lived in Minnesota when she filed each of her three petitions, her appeal presumptively lies with the Eighth Circuit.  *See* I.R.C. § 7482(b)(1).

**[\*6]**　That means we will begin with an overview of relief under 6015:

- the forms of relief;

- the paths to seeking relief; and

- the standards and scope of review when a case comes to us.

We will then analyze a procedural objection that Sample makes to how CCISO and IRS Appeals evaluated her various requests for relief before moving on to our own analysis of each of her requests by type of relief sought and year for which she sought it.

Spouses who file a joint federal income tax return are jointly and severally liable for the income-tax liability they report. I.R.C. § 6013(d)(3). But this is tax law, so there are always exceptions to the general rule, and a spouse who wants to get out of joint liability must look to section 6015.

There are three forms of innocent-spouse relief. Subsection (b) offers relief from an understatement of tax, subsection (c) allows for allocation of a deficiency between separated or divorced spouses, and subsection (f) offers relief even when it is not available under either subsection (b) or (c) if that would be "equitable". Subsection (f) relief is especially valuable because it is the only subsection that allows relief from a failure to pay (underpayment) as well as a failure to correctly report the tax due (understatement).

Just as there are three kinds of relief under section 6015, there are three ways to ask for relief:

- by filing Form 8857 directly with the IRS and then petitioning our Court in a "stand-alone" case if that relief is denied, *see, e.g.*, *Fernandez v. Commissioner*, 114 T.C. 324, 329 (2000);

- by raising innocent-spouse relief as an affirmative defense in a deficiency case; and

- by raising entitlement to innocent-spouse relief at a CDP hearing requested by a taxpayer after the IRS threatens to seize her property to pay unpaid tax bills, *see* I.R.C. § 6330.

*See generally DelPonte v. Commissioner*, 158 T.C. 159, 165 (2022).

**[\*7]**   Our standard and scope of review vary by the path a requesting spouse embarks upon.  If the issue of relief comes up in a stand-alone petition that's filed under section 6015 itself, section 6015(e)(7) tells us that:

> Any review of a determination made under this section shall be reviewed de novo by the Tax Court and shall be based upon—
>> (A) the administrative record established at the time of the determination, and
>> (B) any additional newly discovered or previously unavailable evidence.

*Kruja v. Commissioner*, T.C. Memo. 2019-136, at \*8 n.4.

If the issue of relief comes up in a deficiency case filed under section 6213, the standard and scope of review are entirely *de novo*, as with most issues in our deficiency cases.  *Porter v. Commissioner*, 132 T.C. 203, 208 (2009).

But what if the issue of relief comes up in a CDP case filed under section 6320 or 6330?  Here we meet what might be a small but novel issue.  More than twenty years ago we held that a taxpayer who raises an innocent-spouse defense in a CDP hearing is seeking not just a determination under section 6330, but a determination under section 6015 as well.  That meant that even when we denied review of the CDP determination because the petition was untimely, we could still review that portion of the CDP determination that disposed of the innocent-spouse claim if the petition was timely under section 6015.[5]  *See Raymond v. Commissioner*, 119 T.C. 191, 194 (2002).

This rule—that a taxpayer who asks for relief from enforced collection may effectively combine it with other forms of relief under the Code has been endorsed by circuit courts and made general.  In *Wright v. Commissioner*, 571 F.3d 215, 220 (2d Cir. 2009), *vacating and remanding* T.C. Memo. 2006-273, the Second Circuit held that a taxpayer who asked for interest abatement during his CDP hearing was effectively asking for relief under section 6404 even if he didn't mention that section.  That Court also reasoned that the taxpayer's request meant that, at least for the issue of interest abatement, we should have

---

[5] We established that CDP-borne requests require these dual determinations two decades before the Supreme Court in *Boechler, P.C. v. Commissioner*, 142 S. Ct. 1493 (2022), held the deadline for a CDP petition was nonjurisdictional.

[*8] followed the jurisdictional rules for review of interest-abatement determinations. *Id.* The U.S. Court of Appeals for the Third Circuit has likewise held that payment of the tax bill that led to a CDP hearing might moot a CDP case, but that if the taxpayer has raised interest abatement during that hearing the case would stay alive because "a petition ostensibly filed under [section 6330] can also be viewed as having been filed under section 6404(h)(1) if the taxpayer had raised the issue of interest abatement in his [CDP] hearing."[6] *Ahmed v. Commissioner*, 64 F.4th 477, 487 (3d Cir. 2023) (quoting *McLane v. Commissioner*, T.C. Memo. 2018-149, at *29, *aff'd*, 24 F.4th 316 (4th Cir. 2022)), *vacating and remanding* T.C. Memo. 2021-142.

We ourselves have reasoned that, despite the general rule of *Greene-Thapedi v. Commissioner*, 126 T.C. 1, 8 (2006) (that we can't grant refunds in appeals of CDP determinations), a petition filed under section 6330 "can be viewed as giving independent jurisdiction under another provision that may provide us with the authority to consider overpayment claims" including section 6015(g). *McLane*, T.C. Memo. 2018-149, at *33.

We can therefore safely conclude that Sample's 2017 request for innocent-spouse relief in her CDP hearing transformed the resulting determination, at least to the extent it disposes of spousal defenses, into a determination under section 6015. And that means that we will apply the same standard and scope of review—the standard and scope given to us by section 6015(e)(7)—to this tax year that we do to all the years for which she filed stand-alone petitions. *See Chavis v. Commissioner*, 158 T.C. 175, 182 n.2 (2022) (reserving issue).

Deciding what kind of determination we make also affects the remedy we can provide. Our *de novo* decisions in section 6015 cases do not allow us to send the case back to the IRS. *Friday v. Commissioner*, 124 T.C. 220, 222 (2005).

II.    *Sample's Procedural Objection*

Our analysis of Sample's case is also complicated by the different types of innocent-spouse relief that Sample argues she's entitled to. And

---

[6] When asked to define a determination under section 6330, the Supreme Court answered: "simply a decision as to whether a levy may go forward." *Commissioner v. Zuch*, 145 S. Ct. 1707, 1712 (2025). But when a taxpayer raises innocent-spouse relief during her CDP hearing, section 6015 requires a specific determination as to whether she is entitled to relief under that section. *See* I.R.C. § 6015(e)(7).

[*9] before we bite down on each type of relief and each tax year at issue, we first need to examine a procedural argument that she raises. Sample argues the IRS should have given her the opportunity to present new evidence and rebut the government's fact-finding for all the tax years at issue. She asserts that she had the right to a hearing before CCISO issued its preliminary determinations. Depriving her of that hearing means the AOs had no basis for their denial of her requests because the record was improperly sparse. The Commissioner denies this and insists that his procedures complied with section 6015 for stand-alone innocent-spouse relief.

We see two problems for Sample here. The first is that she didn't take advantage of the opportunities for presenting additional evidence that existing administrative procedures gave her. After she submitted her Form 8857, she chose not to send supplemental material at the administrative level. She also chose not to submit any "newly discovered or previously unavailable evidence" when these cases came before us.[7]

CCISO deemed Sample's Forms 8857 for tax years 2011–14 and 2018 valid and complete at the time she submitted them.[8] Under the IRS's own rules, CCISO is not obligated to ask for additional information unless a Form 8857 is incomplete. *See* IRM 25.15.3.10.3 (Jan. 10, 2020), 25.15.6.8.8 (June 19, 2017). Sample's wasn't. Agencies are free to grant additional procedural rights in the exercise of their discretion, but courts generally can't dictate any such procedures to them. *See Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 524 (1978).

As for the 2018 tax year, Sample cites *Roman v. Commissioner*, 87 T.C.M. (CCH) 835, 837 (2004), for the proposition that we must overturn the IRS's denial of innocent-spouse relief if a taxpayer wasn't afforded a reasonable chance to be heard before the Commissioner issued a notice of determination. In *Roman*, however, we found no abuse of discretion by the IRS—"No statutory or regulatory provision requires that taxpayers be afforded an unlimited opportunity to supplement the administrative record." *Id.*

---

[7] While her request for relief from her 2018 joint liability was in Appeals, her representative argued that part of the record was missing because it "was not technically part of the admin file when the petition was filed." Although Sample was given time to submit the information, she did not send any additional documents.

[8] And when she submitted a request for relief for 2018, her answers were almost identical to her 2011–14 request.

**[\*10]** For her 2017 tax year, Sample was given an opportunity for a hearing under section 6330 before her case came to us.[9]  *See* I.R.C. § 6330(c)(2)(A).  This hearing was her chance to make her best case for innocent-spouse relief.  *See* I.R.C. § 6330(c)(2)(A).  Her choice to not send supplemental material to the AO does not grant her additional procedural rights.  *See Roman*, 87 T.C.M. (CCH) at 837.

III.    *Section 6015(b) Relief*

Sample seeks (b) relief for only her 2014 tax year.  Relief under that subsection requires:

- A joint return for the year at issue;

- an understatement of tax attributable to an erroneous item of the nonrequesting spouse;

- that the requesting spouse didn't know and had no reason to know of the understatement at the time of signing the return;

- that it would be inequitable to hold the requesting spouse liable for the deficiency given all the facts and circumstances; and

- that the claim for relief is timely.

I.R.C. § 6015(b)(1); *Alt v. Commissioner*, 119 T.C. 306, 313 (2002), *aff'd*, 101 F. App'x 34 (6th Cir. 2004).

These conditions are conjunctive—all must be satisfied.  *Reynolds v. Commissioner*, 124 T.C.M. (CCH) 311 (2022) (citations omitted).

Under section 6015(e)(7) our standard of review is *de novo*.  We limit our review to the administrative record because Sample chose not to supplement that record with any newly discovered or previously unavailable evidence.  Sample has the burden of proving she is entitled to relief.  *See* Rule 142(a); *Alt*, 119 T.C. at 311.

---

[9] Taxpayers can raise an innocent-spouse defense at a CDP hearing, but only if the IRS hasn't already made a final determination about that defense in a notice of deficiency or an earlier final determination letter.  Treas. Reg. § 301.6330-1(e)(2).  The regulations also require taxpayers raising such a defense to otherwise comply with the requirements of section 6015 and Revenue Procedure 2013-34, 2013-43 I.R.B. 397.  Treas. Reg. § 301.6330-1(e)(2).

**[\*11]** The root of Sample's problem is the third requirement in the list above—knowledge or reason to know about the understatement at the time she signed her 2014 return. We don't look for knowledge of a particular amount of understatement but what the caselaw calls the "knowledge-of-the-transaction" test. *Cheshire v. Commissioner*, 282 F.3d 326, 332–33 (5th Cir. 2002), *aff'g* 115 T.C. 183 (2000). Under this test, a taxpayer has knowledge when she is "aware of the circumstances that gave rise to the understatement of income." *Wilson v. Commissioner*, 113 T.C.M. (CCH) 1301 (T.C. 2017) (citing *Bokum v. Commissioner*, 94 T.C. 126 (1990), *aff'd*, 992 F.2d 1132 (11th Cir. 1993)).[10]

We do not think that, given their disparate levels of education, Sample should be as familiar as Schara with managing money. When a taxpayer lacks education in finance, it's more likely that she won't be able to figure out any complicated omissions of income. *See Freeman v. Commissioner*, T.C. Memo. 2023-10. But it doesn't take a degree in accounting to recognize that this return looked different. Sample was her husband's office manager, and she was paid from the business's income. Yet the return did not even mention any income from the dental practice, which was almost $200,000 that year. (Their joint returns from 2011–13 had showed annual income of almost $300,000 or more in business income.) Under Treasury Regulation § 1.6015-2(c), failure to question items that a reasonable person would question at or before the time the return was signed creates an inference of knowledge. This return was obviously error-ridden, as Sample's own W-2 income wasn't even reported. The nature of the errors should have prompted a double take on Sample's part.

We also find it more likely than not that she reasonably should have known about other missing income, including capital gain, taxable dividends, and interest. She always had access to her financial accounts. She wasn't deeply involved in managing the finances for their marriage or in her husband's business, but that wasn't because of Schara. She could've checked her records, but she just chose not to. The purpose of section 6015(b)(1)(C) is not to protect the "intentionally ignorant." *Hall v. Commissioner*, 108 T.C.M. (CCH) 199 (2014) (citing

---

[10] In doing this review, we evaluate Sample's knowledge on an item-by-item basis, because apportioned relief is available under section 6015(b). *See* Treas. Reg. § 1.6015-2(e)(1).

**[\*12]** *Cohen v. Commissioner*, T.C. Memo. 1987-537, 1987 Tax Ct. Memo. LEXIS 529, at \*10).

Considering her involvement in the business and the blatant errors in the return, we find it more likely than not that she had reason to know of the understatement.

IV.    *Section 6015(c) Relief*

Next in line is (c) relief for the tax year 2014.  This subsection of 6015 allows for the allocation of a deficiency between spouses.  Winning it requires proof that:

- a joint return was filed for the year for which relief from joint and several liability is requested;

- at the time the election for relief was made, the spouses were divorced, legally separated, or had not been members of the same household at any time during the previous 12 months;

- the requesting spouse sought relief less than two years after the first collection activity with respect to the liability giving rise to the deficiency or understatement;

- the spouses did not transfer property to avoid tax or, if they did, the value of the property transferred is less than the value of the liability for which relief is elected; and

- the requesting spouse did not have actual knowledge at the time the joint return was signed of the items giving rise to the deficiency that are not allocated to the requesting spouse.

I.R.C. § 6015(c)(3).

In reviewing a stand-alone 6015(c) request for relief, we apply a *de novo* standard.  Our scope of review is limited to the administrative record.  I.R.C. § 6015(e)(7).  Relief under subsection (c) is also unusual in that the IRS bears the burden of proving that the requesting spouse had actual knowledge of the item giving rise to the deficiency at the time she signed the return, and not just what a reasonably prudent person would know.  I.R.C. § 6015(c)(3)(C); *Mitchell v. Commissioner*, 292 F.3d 800, 804 (D.C. Cir. 2002), *aff'g* T.C. Memo. 2000-302; *Culver v. Commissioner*, 116 T.C. 189, 196 (2001).

**[\*13]** We find here that the Commissioner has shown that Sample had actual knowledge that her husband's dental practice was earning income that should have been reported. While we recognize that Sample was not financially sophisticated, she worked at the business and knew it was the family's main source of income. We conclude from this that it is more likely than not that she actually knew the dental practice was earning income.[11]

We'll therefore partially deny Sample's request for (c) relief and turn to her request for (f) relief for all the years at issue.

V.     *Section 6015(f) Relief*

A.     *Conditions for Relief*

Subsection (f) of section 6015 is the only possible relief from an unpaid, and not just understated, tax liability. I.R.C. § 6015(f). The Code calls this "equitable" relief. This open-ended term has been cabined by revenue procedures that the Commissioner has issued to help IRS employees figure out which requesting spouses should get relief. As our own standard of review shifted to *de novo*, we continued to analyze requests for equitable relief under these procedures. Neither party here has challenged that practice, and we won't do so ourselves. The current procedure is Revenue Procedure 2013-34. It tells us to organize our analysis into three steps. We first look for "threshold factors" that must all be present to qualify for (f) relief at all. If these are present, we move on to look for facts that entitle a spouse to "streamlined" relief. But if that doesn't work, the revenue procedure gives us an open-ended list of factors that we must weigh before reaching a final decision.

Those threshold factors are whether:

- the requesting spouse filed a joint return for the year for which she is requesting relief;

- relief was not available under (b) or (c);

- the request for relief was timely filed;

---

[11] Because respondent failed to defend the other items that make up the deficiency (e.g., $121 of interest, $17,497 of third-party network transactions, $33 of capital-gain distributions, $24 of taxable dividends, and $376 of education-program payments), we grant partial relief to Sample from the portion of the understatement arising from these items.

[*14] • assets were not transferred between the spouses as part of a fraudulent scheme;

• the nonrequesting spouse did not transfer disqualified assets to the requesting spouse;

• the requesting spouse did not knowingly participate in the filing of a fraudulent joint return; and

• the income tax liability from which the requesting spouse seeks relief is attributable either in full or in part to an item of the nonrequesting spouse or an underpayment resulting from the nonrequesting spouse's income.

Rev. Proc. 2013-34, § 4.01, 2013-43 I.R.B. at 399–400.[12]

We next ask whether the requesting spouse qualifies for streamlined relief. Streamlined relief requires that all these conditions be met:

• The requesting spouse is no longer married to the nonrequesting spouse as of the date the determination was made by the Service.

• The requesting spouse would suffer economic hardship if equitable relief was not granted.

• The requesting spouse did not know or have reason to know that there was an understatement or a deficiency on the joint return or did not know or have reason to know that the nonrequesting spouse would not or could not pay the underpayment of tax reported on the joint return.

*Id.* § 4.02, 2013-43 I.R.B. at 400.

---

[12] The Commissioner has conceded that Sample meets all the threshold conditions for all the years at issue. We discern that Sample's separation agreement shifted all assets (including their shared Montana home worth $650,000) to Sample while all debts went to Schara. The timing of the separation—which came shortly after the Department of Justice filed suit to foreclose on Sample's residence—might make this transfer look like an effort to protect their home from IRS collections. *See United States v. Schara,* No. 19-cv-696 (D. Minn. filed Mar. 14, 2019). But the Commissioner, for whatever reason, has conceded that there was not a disqualified transfer of assets relating to the tax year at issue. With this in mind, we find that Sample satisfies these threshold factors.

**[\*15]** If a spouse crosses the threshold, but stumbles into the streamlined factors we move on to the multifactor balancing test of Rev. Proc. 2013-34, § 4.03 to decide whether it would be inequitable to hold Sample liable for all or part of her unpaid income tax liability.

The list of factors:

- the taxpayer's marital status,

- whether the requesting spouse will suffer economic hardship absent relief,

- whether the requesting spouse had knowledge or reason to know that the nonrequesting spouse wouldn't or couldn't pay the liability,

- whether either spouse had a legal obligation to pay the liabilities,

- whether the requesting spouse significantly benefited from the underpayments,

- whether the requesting spouse complied with the income tax laws in the years following those to which the request for relief relates, and

- the requesting spouse's mental or physical health.

*Id.* § 4.03(2), 2013-43 I.R.B. at 400–03.

This list is open-ended, but Sample has not suggested any other factors for us to consider.

  B. *Streamlined Relief*

Sample must show that she meets all three factors to win streamlined relief. But we can decide this part of her cases by drilling down on only one—whether she would suffer economic hardship were we not to grant her relief. *See* Rev. Proc. 2013-34, § 4.02(2).

We are meant to evaluate Sample's financial situation at the time of trial, but because this is a decision under Rule 122, we will determine whether economic hardship exists based on the facts available in the record. *See Pullins v. Commissioner*, 136 T.C. 432, 446 (2011). The revenue procedure says that if Sample's income is below 250 percent of

[*16] the federal poverty guidelines or if her monthly income exceeds her reasonable basic monthly living expenses by only $300 or less, the Commissioner (and we) would likely find this factor to favor relief. *See* Rev. Proc. 2013-34, § 4.03(2)(b). Sample reports her total monthly income as $12,000—$4,000 in wages and $8,000 in alimony—in every innocent-spouse request she filed. This exceeds the 250% threshold. Her monthly income also exceeds her reasonable basic monthly living expenses ($10,500) by more than $300, which is another way of showing economic hardship. *See id.*

In a situation like Sample's, where one spouse has a good income and a reasonable margin of income over expenses, the Revenue Procedure still tells us to look at other facts and circumstances. We think there are two of those here. The first are her assets. Sample reported having $896,693 worth of assets, including her home, car, Montana property, 401K, and bank accounts. (Though we do note that her home and car are encumbered with secured debt that totals more than $200,000.) We also note that, though legally separated, she still lives with her husband, with all the sharing of expenses that makes possible.

We therefore find with a considerable preponderance of evidence that she could "make payments towards the tax liability" while still having enough income for her reasonable living expenses. *Id.*

This leaves us with a case of "hypothetical hardship" that can't justify relief. *See Pullins*, 136 T.C. at 446. Streamlined relief is not appropriate for any of the tax years at issue.

C.    *Equitable Relief*

Without streamlined relief, we will look at each of the several factors that the Revenue Procedure says we should consider as part of a multifactor test. And we consider separately her claims for relief for each year for some of the factors.

We also note that Sample is eligible only for partial equitable relief because one of the items, her wages, can be attributed fully to her. *See* Rev. Proc. 2013-34, § 4.01(7). And because we have already evaluated Sample's economic hardship, we will not repeat that analysis.

[*17]  1.  *Marital Status*

The first of these remaining factors is Sample's marital status on the date of the IRS's determination. *See id.* § 4.03(2)(a). Perhaps with our *de novo* standard of review we should consider her status as of the date of the cases' submission. But it doesn't matter, because Sample was legally separated from Schara in March 2019. That's enough for Sample's marital status to count in favor of relief.

2.  *Knowledge*

There are separate standards for knowledge of an underpayment versus an understatement, so we must analyze her underpayments for the 2011–14, 2017, and 2018 tax years separately from her understatement for the 2014 tax year. We evaluate Sample's knowledge as of the date she filed each joint return at issue. *See id.* § 4.03(2)(c).

a.  *Underpayment from 2011–14*

When Sample signed the joint returns for 2011, 2012, 2013, and 2014, she had little reason to suspect anything was wrong with their accounts. The couple definitely owed money to the IRS, but Schara had given his word that he would pay the bill and that their tax balances were "just temporary." She knew he was meeting with accountants and creditors to make things right. The IRS insists Sample knew they had a balance due for 2004, 2009, and 2010, but the record we have doesn't show any evidence that those liabilities were still unpaid. We therefore find it more likely than not that Sample did not know or have reason to know that Schara would not be able to cure the underpayment. We find this factor weighs in favor of relief.

b.  *Understatement from 2014*

While Sample didn't have reason to know Schara could not pay their 2014 tax liability, she did have reason to know he underreported his business income when she filed her joint return for 2014. The items at issue were Sample's own wages from Schara's dental office and Schara's business income from his dental practice. Because she was employed by Schara, she had insight into his income and expenses. *Cf. Leith v. Commissioner*, 120 T.C.M. (CCH) 299 (2020) (finding that petitioner could not have known her ex-spouse's income because they maintained separate jobs as well as separate bank accounts). She wrote that plainly on her application for relief—"I knew [Schara] had substantial income coming from his dental practice." Because Sample

[*18] had reason to know of the underreported income when she filed her joint return for 2014, we find this factor weighs against relief. *See* Rev. Proc. 2013-34, § 4.03(2)(c)(i).

####   c.   *Underpayments from 2017 and 2018*

Sample had reason to know at the time of filing that Schara could not correct the underpayments of tax from their joint tax returns for 2017 and 2018. *See id.* § 4.03(2)(c)(ii).

Sample maintains in every initial innocent-spouse request that Schara consistently told her he would pay off their tax debt. But Sample's behavior after learning of the extent of their debt leads us to believe otherwise. She first learned there was trouble with the IRS when a revenue officer visited the dental office in 2015. This revelation that they owed money to the IRS didn't faze her. It was learning the extent of their tax debt that prompted her to act.

Her knowledge of the underpayment for the 2018 tax year is especially evident. Once the Department of Justice targeted her and Schara in *Schara*, No. 19-cv-696, to collect their unpaid federal tax liabilities, Sample was very quick to try to protect herself from their mountain of marital debts. The case was filed on March 14, 2019, the couple was separated less than two weeks later, and her first innocent-spouse claim was submitted less than a month after. She did not want to be the government's last resort. This chain of defensive actions by Sample leads us to believe that by the time her tax return was filed in November 2019, she knew her husband wouldn't foot the bill. So this is also a factor against granting Sample's request.

####   3.   *Legal Obligation*

This factor weighs in favor of relief if the nonrequesting spouse has the sole legal obligation to pay the outstanding tax liability, according to a binding agreement like a divorce decree. *See* Rev. Proc. 2013-34, § 4.03(2)(d), *superseding* Rev. Proc. 2003-61, 2003-2 C.B. 296. But this factor is neutral if, at the time the separation decree was entered, Sample knew or had reason to know that Schara would likely fail to pay the liability. *See id.* Based on the analysis above, we find it more likely than not that when Sample signed the separation agreement, she didn't think Schara could pay. We find this factor neutral.

[*19]        4.    *Significant Benefit*

The next factor is whether Sample received a significant benefit as a result of the couple's unpaid tax liability. *See* Treas. Reg. § 1.6015-2(d). The IRS concedes there is no evidence of significant benefit for tax years 2011–14. We agree and will go one step further to say that there is no evidence Sample received more than normal support for tax years 2017 and 2018 as well.

Sample was awarded multiple properties under her separation agreement with Schara, including a car and their shared second home in Montana. But Sample's separation proceeds were not acquired because of their failure to pay their 2017 and 2018 tax. *See Zaher v. Commissioner*, 103 T.C.M. (CCH) 1071, 1074 (2012) (weighing this factor in favor of relief because the assets awarded in divorce were bought before their joint tax liability arose). That Schara transferred property to Sample is not enough to weight this factor against relief, as the benefit must be traceable to the omission of income. *See id.* And while we could weigh this factor against relief if there were signs of excessive spending, we find none here. Sample doesn't live a life of luxury, traversing the world on expensive vacations, sporting couture in sophisticated sports cars. *See* Rev. Proc. 2013-34, § 4.03(2)(e). Because we do not see the typical hallmarks of significant benefit, we will not find that Sample had more than normal support from her unpaid tax liability. *See Zaher*, 103 T.C.M. (CCH) at 1074. That makes this factor neutral. *See* Rev. Proc. 2013-34, § 4.03(2)(e).

        5.    *Compliance*

Whether Sample complied with the income tax laws following her separation from Schara is also a factor. *See id.* § 4.03(2)(f)(i). The Commissioner concedes that this factor favors Sample.

        6.    *Physical and Mental Health*

The last factor is Sample's physical and mental health. *See id.* § 4.03(2)(e). Sample checked the "no" box on every Form 8857 she submitted when asked whether she had or has a physical or mental health problem. So, this is a neutral factor.

The following chart depicts the results of the analysis:[13]

---

[13] We use an em dash when a factor is neutral.

| [*20] *Factors* | *Tax Years* | | | | |
|---|---|---|---|---|---|
| | 2011–13 | 2014 | | 2017 | 2018 |
| | | U/P | U/S | | |
| Marital Status | For | For | For | For | For |
| Economic Hardship | — | — | — | — | — |
| Knowledge | For | For | Against | Against | Against |
| Legal Obligation | — | — | — | — | — |
| Significant Benefit | — | — | — | — | — |
| Compliance | For | For | For | For | For |
| Physical & Mental Health | — | — | — | — | — |

As with all multifactor tests, one must have some way of weighing the factors and answering the ultimate question. That ultimate question here is whether granting relief would be "equitable". One way of looking at this, we think, is whether there was a point when Sample should reasonably have reacted to Schara's tax troubles by disentangling herself from the economic union of a married couple, and especially from the filing of joint returns.

## CONCLUSION

Our review of the record for the 2011, 2012, 2013, 2014, 2017, and 2018 tax years leads us to a split decision, with the dividing line being Sample's learning of the IRS's visit in 2015. Before then, she was reasonably ignorant of her husband's underpayments for 2011 through 2013. But we also find she knew of the understatements—very substantial understatements—starting with the 2014 return.

We will thus grant her equitable relief for tax years 2011 through 2013 and deny her relief for tax years 2014, 2017, and 2018.

To reflect the foregoing,

*An order directing the parties to agree on the wording of the decisions in these cases will be issued.*